**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

FELISHA RICH MOORE,                )
                                   )
              Plaintiff,           )
                                   )
       v.                          )        1:12CV503
                                   )
DAN HOLDINGS, INC., a North        )
Carolina Corporation; DIVERS       )
ALERT NETWORK, INC., a North       )
Carolina corporation; and          )
WILLIAM ZIEFLE,                    )
                                   )
              Defendants.          )

**MEMORANDUM OPINION AND ORDER**

This case comes before the Court on (1) Defendants' Motion for Protective Order Regarding Certain Topics Listed in Plaintiff's Amended Rule 30(b)(6) Notice of Deposition (Docket Entry 31); (2) Defendants' Motion for Protective Order Regarding Plaintiff's Notice to Depose Defendants' Legal Counsel (Docket Entry 33); (3) Plaintiff's Motion to Extend the February 27, 2013 Discovery Deadline (Docket Entry 35); (4) a Motion to Quash and/or Modify Third-Party Subpoena Served upon Chris Moore (Docket Entry 37); (5) Plaintiff's Motion to Compel Discovery (Docket Entry 41); and (6) Defendants' Motion to Compel Compliance with Subpoena (Docket Entry 45). (See Docket Entries dated Mar. 26 and Apr. 9, 2013.) For the reasons that follow, the Court will grant Defendants' Motions for Protective Orders, will deny Plaintiff's Motion to Compel further responses to written discovery, except as to Interrogatory No. 4 (as to which Defendants must serve Plaintiff with a limited response), Document Request No. 11 (as to which

Defendants must make a sealed submission to the Court), and Document Request No. 16 (as to which Defendants must prepare a limited response for possible future service upon Plaintiff), and will deny (with instructions) Plaintiff's Motion to Compel as to Dan Orr's deposition, the competing motions regarding Chris Moore's deposition, and Plaintiff's discovery extension motion.

## I. Defendants' Motions for Protective Orders

Defendants seek to limit the scope of the corporate Defendants' Rule 30(b)(6) deposition(s) and to prevent Plaintiff from deposing Defendants' counsel regarding her investigation into Plaintiff's allegations of discrimination and retaliation. (See Docket Entries 31 and 33.) With respect to the Rule 30(b)(6) deposition(s), Defendants originally moved the Court to enter a protective order for the purposes of: "(a) protect[ing] from disclosure with respect to Topics 1, 2, 5, 8, 9, 10, and 12 information about Defendants' communications with legal counsel and work product of Defendants' legal counsel or otherwise since the information is protected by the attorney-client privilege and/or work-product doctrine; (b) limit[ing] the scope of inquiry with respect to Topics 1, 2, 8, and 12; and (c) exclud[ing] Topic 13 from the scope of inquiry." (Docket Entry 31 at 5.) Subsequently, in their Reply, Defendants represented that "disputes with respect to Topics 8, 12, and 13 are now moot. Counsel for the [P]arties also resolved conflict with respect to Topics 1, 2, and 10, except to the extent that Plaintiff continued to seek privileged information. Therefore, what remains before the Court are

-2-

Defendants' objections relating to matters protected by the attorney-client privilege and/or work product doctrine in Topics 1, 2, 5, 9, and 10." (Docket Entry 53 at 1-2 (internal citations and footnotes omitted); see also Docket Entry 47 at 18.)

Via Topics 1, 2, 5, 9 and 10, Plaintiff seeks to depose the corporate Defendants' Rule 30(b)(6) witness regarding:

1. For the time-period of 2008 through the present, communications between [the corporate] Defendants' respective Board of Directors and [Defendant] William Ziefle about the claims and defenses at issue in this case. Topic areas may include, but are not limited to: (i) the underlying lawsuit; (ii) Plaintiff's internal complaint of discrimination; (iii) Plaintiff's [Equal Employment Opportunity Commission ("EEOC")] charge; (iv) Plaintiff's employment with the Defendants; (v) prior lawsuits, charges and/or internal complaints alleging discrimination and/or retaliation; (v) [sic] investigations of lawsuits, charges and/or internal complaints alleging discrimination and/or retaliation; (vi) Defendants' human resources policies and procedures.

2. For the time-period of 2008 through the present, communications made at Board of Directors' meetings and/or other company functions between any of [the corporate] Defendants' respective Board of Directors (but not [Defendant] Ziefle) about the claims and defenses at issue in this case. Topic areas may include, but are not limited to: (i) the underlying lawsuit; (ii) Plaintiff's internal complaint of discrimination; (iii) Plaintiff's EEOC charge; (iv) Plaintiff's employment with the Defendants; (v) prior lawsuits, charges and/or internal complaints alleging discrimination and/or retaliation; (v) [sic] investigations of lawsuits, charges and/or internal complaints alleging discrimination and/or retaliation; (vi) Defendants' human resources policies and procedures.

. . . .

5. Plaintiff's employment with the Defendants, including but not limited to Plaintiff's work

history; disciplinary history; wages; benefits; job
performance; and separation from the Defendants.

. . . .

9.    Plaintiff's  complaint  and  charge  of
discrimination/retaliation  and  the  Defendants'
investigation of the same.

10.   Mercy  Njenga's  complaint  and  charge  of
discrimination/retaliation  and  the  Defendants'
investigation of the same.

(Docket Entry 31-1 at 4-5.)[1]   The Parties' dispute over these

Topics and the deposition of Defendants' counsel thus involves the

same basic question:  whether the attorney-client privilege and/or

the work product doctrine preclude discovery into Defendants'

investigation of Plaintiff's allegations and/or Ms. Njenga's EEOC

charge.  (See Docket Entry 32 at 10-18; Docket Entry 34 at 9-18;

Docket Entry 47 at 8-13; Docket Entry 50 at 6-16; Docket Entry 53

at 2-10; Docket Entry 57 at 2-10.)[2]

_____

[1] The Complaint describes Defendant Ziefle as the "Chief
Executive Officer . . . of the [corporate] Defendant[s]" from 2010
until February 2012.  (Docket Entry 1 at 2.)  It also appears that
Defendant Ziefle served as Defendant DAN Holdings, Inc.'s general
counsel at one point (see Docket Entry 47 at 10) and that the
corporate Defendants designated him to serve as their Rule 30(b)(6)
witness in this action (id. at 3).  Plaintiff has identified Ms.
Njenga as "a[n] [] African-American [former] employee of Defendants
who complained of race discrimination and retaliation and
thereafter filed an EEOC charge."  (Docket Entry 42 at 16.)

[2] It appears that, with respect to these Topics, to the extent
Plaintiff sought information not directed to such investigations,
Defendants responded, including by "answer[ing] questions
concerning Defendants' investigation into [Ms.] Njenga's internal
complaint" (Docket Entry 53 at 2 n.3) (as contrasted with the
subsequent investigation into her EEOC charge).  Accordingly, as to
Ms. Njenga, the Court will address only issues concerning discovery
regarding Defendants' investigation into her EEOC charge.

-4-

The United States Court of Appeals for the Fourth Circuit employs the classic test regarding the attorney-client privilege:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

In re Grand Jury Subpoena: Under Seal, 415 F.3d 333, 338 n.3 (4th Cir. 2005). The work product doctrine applies to material "prepared *because* of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation." National Union Fire Ins. Co. v. Murray Sheet Metal Co., Inc., 967 F.2d 980, 984 (4th Cir. 1992) (emphasis in original). The burden rests on the party resisting discovery to demonstrate the applicability of either the attorney-client privilege or the work product doctrine. See Solis v. Food Emp'rs Labor Relations Ass'n, 644 F.3d 221, 232 (4th Cir. 2011); In re Grand Jury Subpoena, 415 F.3d at 338-39.

A. Investigation of Plaintiff's Allegations

Defendants retained outside counsel regarding Plaintiff's allegations of discrimination and retaliation. (See Docket 32-2 at 4.) Plaintiff argues that, as to any investigation made by such counsel, "Defendants have waived, in whole or part, any valid

-5-

privilege objections" (Docket Entry 47 at 9), by "asserting a number of 'good faith' and similar defenses" (id.). In support of that position, Plaintiff cites Chivers v. Central Noble Cmty. Sch., No. 1:04-CV-00394, 2005 WL 6567356, at *2-4 (N.D. Ind. Aug. 4, 2005) (unpublished), and Pray v. New York City Ballet Co., No. 96 CIV 5723 RLC, 1998 WL 558796, at *2 (S.D.N.Y. Feb. 13, 1998) (unpublished). (See Docket Entry 47 at 9-10.) This argument lacks merit because both Chivers and Pray (and other cases like them) addressed discovery of investigations related to harassment claims.

In the harassment context, the reasonableness of remedial measures represents a key issue in determining liability. See Chivers, 2005 WL 6567356, at *2 (observing that the plaintiffs had to "prove that the defendants had actual knowledge of the sexually harassing conduct, and that the defendants' response to it was 'clearly unreasonable' under the circumstances," such that discovery about the defendants' investigation "is likely to speak directly to whether [they] had actual knowledge of all of the circumstances surrounding the allegations and whether their response to such allegations was 'clearly reasonable'"); Pray, 1998 WL 558796, at *2 ("Once an employer is made aware that its employees are being subject to sexual harassment, it is under an obligation to take reasonable steps to remedy it, and whether the employer's responsibility for remediation has been fulfilled is determined by the facts in each case." (internal citation omitted)); see also Freeman v. Dal-Tile Corp., ___ F. Supp. 2d ___, ___, 2013 WL 1010601, at *19 (E.D.N.C. Mar. 14, 2013) ("'The

negligence analysis can be divided into two separate inquiries, looking first, into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses.'" (quoting Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1244 (10th Cir. 2001)). Plaintiff asserts that, "although [Chivers and Pray] involve sexual harassment claims, the principles underlying those cases (including as to waiver arguments) are fully applicable here" (Docket Entry 47 at 9 n.4), but offers no reasoning or authority to establish how her claims (none of which involve harassment) depend in any way on any investigation conducted by Defendants' counsel (see id.).[3]

Moreover, a review of Defendants' cited defenses (see id. at 9 (citing "Answer [Fifth, Eighth & Eleventh Affirmative Defenses] (Docket Entry No. 7)" (brackets in original))) refutes the notion that Defendants have made their counsel's investigation of Plaintiff's allegations an issue in this case:

**FIFTH AFFIRMATIVE DEFENSE**
Defendants have at all times acted in a good faith and in a lawful manner towards Plaintiff; all personnel

---

[3] Plaintiff (whose Complaint demands punitive damages (see Docket Entry 1 at 12)) also states:

The viability of a punitive damages claim turns upon whether, among other things, Defendants' [sic] committed unlawful acts against Plaintiff in bad-faith. Thus, Defendants' alleged good-faith conduct . . . – such as by purportedly conducting appropriate investigations into discrimination complaints – is clearly relevant . . . .

(Docket Entry 47 at 9 n.4.) Again, however, Plaintiff has not explained or cited authority showing how any investigation by Defendants' counsel could affect a punitive damages award for claims arising prior to any such investigation. (See id.)

-7-

decisions with respect to Plaintiff, including but not limited to any decisions with respect to promotion, advancement, and compensation, were made for legitimate, non-discriminatory, and non-retaliatory business reasons. To the extent that Plaintiff's employment with [Defendant] DAN Holdings, Inc. is deemed to have been involuntarily terminated, which is hereby expressly denied, Plaintiff's termination was made for legitimate, non-discriminatory, and non-retaliatory business reasons.

.    .    .    .

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's negligent retention and supervision claim is barred because [Defendant] Ziefle did not commit a tortious or unlawful act against Plaintiff, and because [Defendant] Ziefle was competent and fit for his job position. Further, [Defendants] DAN Holdings, Inc. and Divers Alert Network, Inc. had no reason to believe that any of their employees, including [Defendant] Ziefle, was incompetent or unfit for their respective job positions, or that any employee had the proclivity to engage in an unlawful act, or to believe that any of their employees actually engaged in an unlawful act.

.    .    .    .

### ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails to allege any facts which would support an award of punitive damages or any claims pursuant to which punitive damages are recoverable. Defendants at all times acted in good faith and in a lawful manner towards Plaintiff and had reasonable grounds to believe that their actions did not violate any statutes relied upon by Plaintiff or any other law. Defendants' lack of willfulness or intent to violate such statutes or other law is asserted as a defense to any claim for punitive damages.

(Docket Entry 7 at 13-15.)

Although these defenses do not reference any investigation by Defendants' counsel, Plaintiff points to this exchange from Defendant Ziefle's deposition to show that the investigation by Defendants' counsel nonetheless constitutes part of these defenses:

[Plaintiff's Counsel]:   What's evidence – what – what
                         are good faith actions to you

|                        | in connection with this case that the companies took – or you took toward [Plaintiff]? |
|------------------------|---------------------------------------------------------------------------------------|

. . . .

[Defendant Ziefle]: Open and honest communication about her job performance. . . . About where we needed to have improvement, exploring other possible opportunities for her within the organization. I mean all of the things that we've talked about here today, none of it was done with a design or with an intent or even with a decision that she wasn't going to be with the company going forward.

Everything we did was to try to make sure that she stayed on as an employee and that we found something that she would enjoy doing and could contribute to the company. To me that's good faith.

. . . .

[Plaintiff's Counsel]: Okay. What about -- did you conduct the internal investigation into her complaint in good faith?

[Defendant Ziefle]: Again, I hired legal counsel to give me legal advice. To me that's good faith.

[Plaintiff's Counsel]: That's good faith. So that's good faith, you think, for purposes of a defense?

[Defendant Ziefle]: Again, I'm not a North Carolina lawyer. I've never practiced in federal court. I can only tell you what I know, what you're asking. To me that appears to be good faith.

(Docket Entry 47-9 at 19-21.)

This exchange does not support Plaintiff's position that Defendants have made their counsel's investigation a part of any affirmative defense. To the contrary, when asked to identify "good faith actions . . . [Defendants] took toward [Plaintiff]," Defendant Ziefle did not mention any investigation. Plaintiff then inquired whether Defendant Ziefle "conduct[ed] the internal investigation into [Plaintiff's] complaint in good faith." When Defendant Ziefle responded that he believed he acted in good faith by hiring an attorney, Plaintiff's counsel raised the specific issue of an affirmative defense and Defendant Ziefle made clear that he did not know whether hiring a lawyer constituted a defense.

Beyond the fact that the testimony cited by Plaintiff does not show that Defendants have injected their counsel's investigation into the case, Defendants expressly have stated that they "have not raised, and have confirmed that they do not intend to raise, the adequacy of any investigation done by their legal counsel as a defense." (Docket Entry 53 at 6; see also id. at 7 ("Nonetheless, to the extent Plaintiff claims that Defendants made the adequacy of their legal counsel's privileged investigation at issue, which Defendants expressly deny, Defendants confirm that the adequacy of their legal counsel's privileged investigation is not being asserted as a defense.").) Plaintiff, however, argues that, even if Defendants did not place their counsel's investigation at issue via any asserted defense, they waived the attorney-client privilege by using counsel to conduct a factual investigation in the ordinary course of business. (See Docket Entry 47 at 10-11 ("[T]he

-10-

investigator (Defendants' counsel) compiled the facts and drew the conclusions about how Defendants should respond to the complaint [and] . . . Defendants cannot immunize their internal investigation of Plaintiff's complaint - which admittedly was conducted in the ordinary course of business - under the cloak of attorney-client and/or other privileges simply by asking outside counsel to conduct the investigation.").)  This contention also falls short.

As an initial matter, the assertion that Defendants' counsel investigated Plaintiff's allegations as part of the ordinary course of Defendants' business cannot withstand scrutiny, as revealed by this exchange during Defendant Ziefle's Rule 30(b)(6) deposition:

| [Plaintiff's counsel]: | Okay. Is an investigation into an internal complaint normally done by Defendants in the ordinary course of business? |
| --- | --- |
| [Defendants' counsel]: | Objection. |
| [Defendant Ziefle]: | We had done investigations in-house in the past.  As I examined what was best in the long-term interest of the company as far as addressing those complaints if and when they arise, I've come to the conclusion it's actually better to bring in a third party, certainly to consult with legal counsel and follow their advice. |
| [Plaintiff's counsel]: | Well, have Defendants always -- regardless of who conducted the investigation -- investigated in the ordinary course of business internal complaints and discrimination? |
| [Defendant Ziefle]: | Uh-huh. |

(Docket Entry 42-12 at 3.) This testimony reflects that Defendant Zeifle retained counsel not to conduct an investigation as part of the normal course of business, but rather that he retained counsel to provide legal advice. Moreover, elsewhere in his deposition, Defendant Ziefle testified that he knew of no previous time Defendants used outside counsel to investigate such allegations (id. at 9) and that Defendants "retained counsel to give [them] legal advice about what were apparently -- potential claims from an employee" (Docket Entry 56-6 at 11).

With respect to her argument that an attorney who compiles facts effectively waives the attorney-client privilege, Plaintiff cites Harding v. Dana Transp., Inc., 914 F. Supp. 1084, 1096 (D.N.J. 1996), with the following parenthetical reference: "finding that [the] defendant waived attorney-client privilege by fusing roles of internal investigator and legal advisor." (Docket Entry 47 at 11.) The cited portion of Harding does not support Plaintiff's position. See Harding, 914 F. Supp. at 1096. To the contrary, on the cited page, the Harding Court discussed cases in which defendants directly invoked legal advice as a defense and the fact that the defendant in the harassment case before it "ha[d] attempted to utilize the results of [its counsel's investigation] both as a defense to liability . . . and as an aspect of its preparation for the . . . trial itself." Id.

Additionally, elsewhere in Harding, the court expressly rejected the very argument that Plaintiff now presents:

-12-

> [The plaintiffs] assert [that the defendant's attorney] was acting as a fact finder or investigator, and that legal acumen was not required or utilized when he conducted the interviews. The court does not find this argument persuasive as this view overlooks Supreme Court teaching that:
>
> > the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice. The first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant.
>
> Upjohn [Co. v. United States], 449 U.S. [383,] 390 [(1981)]. In Upjohn, the Court confronted the complexities of corporate representation. The Court noted that having a corporation as a client necessitates obtaining factual information from a number of individuals within that corporation. Id. at 391. Thus, an attorney who interviews various individuals within a corporation may do so with the intent to enhance client representation.

Harding, 914 F. Supp. at 1091 (internal footnote and parallel citations omitted). Simply put, Harding refutes, rather than supports, Plaintiff's position.

Finally, Plaintiff asserts that "Defendants still must be [sic] produce a corporate designee to testify about factual information relating to [the] internal investigations . . . . In particular, Defendants' designee should be required to testify about the identities of the witnesses interviewed; the length of each witness interview; facts conveyed during the interview; the length of each internal investigation; and the like." (Docket Entry 47 at 15.) This argument cannot stand. Although the attorney-client privilege "does not protect disclosure of the

underlying facts by those who communicated with the attorney,"
Upjohn, 449 U.S. at 395, "[d]iscovery was hardly intended to enable
a learned profession to perform its functions . . . on wits
borrowed from the adversary," id. at 396 (internal quotation marks
omitted). In other words, although Defendants cannot prevent fact
witnesses from presenting information during the course of
discovery simply because such witnesses also provided information
to Defendants' counsel, Plaintiff may not attempt to learn the
underlying facts simply by using discovery to inquire about the
investigation conducted by Defendants' counsel.[4]

In sum, the attorney-client privilege and the work product
doctrine protect from discovery the investigation by Defendants'
counsel into Plaintiff's allegations. As a result, the Court will
grant Defendants' Motions for Protective Order (Docket Entries 31
and 33) as to such matters.

---

[4] To the extent Plaintiff relies on Farzan v. Wells Fargo
Bank, No. 12 Civ. 1217(RJS)(JLC), 2012 WL 6763570, at *3 (S.D.N.Y.
Dec. 28, 2012) (unpublished), for the proposition that "'disclosure
of who [the attorney] interviewed as part of her investigation does
not reveal [the defendant's] legal strategy, its analysis of [the
plaintiff's] claims, or other protected information'" (Docket Entry
47 at 15), the Court finds persuasive the contrary determination of
other courts, see, e.g., Tracy v. NVR, Inc., 250 F.R.D. 130, 132
(W.D.N.Y. 2008) ("[D]isclosure of the identities of witnesses
interviewed and contacted would inevitably teach the requesting
party which individuals opposing counsel considers more or less
valuable as witnesses and how he or she is preparing for trial."
(internal brackets and quotation marks omitted)); Commonwealth of
Mass. v. First Nat'l Supermarkets, Inc., 112 F.R.D. 149, 153 (D.
Mass. 1986) ("I agree with the line of cases . . . which hold that
interrogatories which seek the names of persons interviewed by an
adverse party's attorney . . . are improper.").

B. <u>Investigation of Mercy Njenga's EEOC Charge</u>

Defendants rely on the work product doctrine to prevent discovery regarding their investigation of Ms. Njenga's EEOC charge. (<u>See</u> Docket Entry 53 at 9.) Plaintiff contends that the work product doctrine cannot protect Defendants' investigation of Ms. Njenga's EEOC charge because "Defendants' investigation was not conducted by outside counsel, nor was outside or other counsel consulted during the investigation" (Docket Entry 47 at 13), and because "Defendants' investigation was conducted by [Defendant] Ziefle in a non-legal capacity and in the ordinary course of Defendants' business" (<u>id.</u>). The Court rejects Plaintiff's contention in those regards based on:

(1) persuasive authority that an investigation following an EEOC charge constitutes activity in anticipation of litigation, <u>see, e.g.</u>, <u>Malin v. Hospira, Inc.</u>, No. 08C4393, 2010 WL 3781284, at *2 (N.D. Ill. Sept. 21, 2010) (unpublished) ("[The] interview notes were a response to [the] plaintiff's EEOC charge. [The] [p]laintiff argues that because the notes were made in conjunction with what [the] plaintiff calls a 'routine investigation' then they do not fall under the work product privilege. But, again, we must consider the entirety of the events. [The] [p]laintiff had already filed her charge of discrimination. The notes were, therefore, prepared with 'an eye toward litigation' and fall within work product protection." (internal footnotes omitted)); <u>Mills v. Federal Express Corp.</u>, 186 F.R.D. 376, 387-88 (W.D. Tenn. 1999) ("[O]nce [the] plaintiff announced her intention to move forward

-15-

under federal discrimination laws by filing a racial discrimination charge with the EEOC . . ., the investigatory work carried on by [the] defendant's employees was done in anticipation of litigation."); and

(2) the fact that the work product doctrine does not apply only to investigations conducted by counsel, see Fed. R. Civ. P. 26(b)(3)(A) ("[A] party may not discover documents and tangible things that are prepared in anticipation of litigation . . . by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent."); see also Stewart v. Falley's Inc., No. 00-1124-WEB, 2001 WL 1318371, *2 (D. Kan. Feb. 14, 2001) (unpublished) ("[The] plaintiff argues that [the] defendant must also show that the memorandum was prepared at the direction of an attorney.  The court disagrees.  The 1970 amendments to Rule 26 expressly extend the work product protection to documents prepared for litigation by the adverse party itself or its agent." (citation omitted)).

Nor has Plaintiff established a substantial need for information related to Defendants' investigation of Ms. Njenga's EEOC charge so as to overcome the protection afforded by the work product doctrine.  Instead, Plaintiff merely states:

> Even assuming arguendo that the work product privilege was applicable to any of the internal investigations at issue, Plaintiff has demonstrated a 'substantial need' for the requested information based upon its relevance and importance to her claims and the fact that Plaintiff has unsuccessfully (due to Defendants' objections to written discovery and/or at other depositions) tried to obtain the information through other means.

(Docket Entry 47 at 14 n.6.)  This conclusory statement does not suffice.  See, e.g., Hallmark Cards, Inc. v. Murley, No. 09-0377-CV-W-GAF, 2010 WL 4608678, at *6 (S.D.N.Y. Nov. 9, 2010) (unpublished) ("Incantation of the substantial need standard and assertions that the need is 'obvious' are not sufficient . . . ."); Marchello v. Chase Manhattan Auto Fin. Corp., 219 F.R.D. 217, 219 (D. Conn. 2004) ("[The] [p]laintiff's conclusory allegation that he has a 'substantial need' is not enough to meet the standard.").

Accordingly, the Court concludes that the work product doctrine protects Defendants' investigation into Ms. Njenga's EEOC charge from discovery and thus will grant that aspect of Defendants' Motion for Protective Order (Docket Entry 31) as well.

### C. Expenses

When a court rules on a motion for a protective order, "[Federal] Rule [of Civil Procedure] 37(a)(5) applies to the award of expenses."  Fed. R. Civ. P. 26(c)(3).  That cross-referenced rule provides, in relevant part, as follows:

> If the motion is granted -- . . . the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees.  But the court must not order this payment if:
>
> (i) the movant filed the motion before attempting in good faith to obtain [relief] without court action;
>
> (ii) the opposing party's [action] was substantially justified; or
>
> (iii) other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(a)(5)(A) (emphasis added). Because the Court

has granted the instant Motions, it will order Plaintiff to show

cause why she and/or her counsel should not have to pay the

reasonable expenses Defendants incurred in bringing said Motions.

## II. Plaintiff's Motion to Compel

As a result of further discovery disputes, Plaintiff

moves the Court for an order: (i) granting Plaintiff's
motion to compel discovery; (ii) compelling Defendants to
fully respond to certain written discovery requests
identified by Plaintiff; (iii) compelling Defendants to
submit to the Court for *in camera* review the documents
identified in their privilege log; (iv) compelling
Defendants to produce their corporate designee(s) to
complete the Rule 30(b)(6) deposition; (v) compelling
Defendants to produce Dan Orr for deposition;
(vi) awarding Plaintiff the expenses, including
reasonable attorneys' fees, incurred in having to bring
this motion; and (vii) granting such other relief that is
just and appropriate.

(Docket Entry 41 at 1.)

### A. Plaintiff's Interrogatories and Document Requests

Plaintiff asks the Court to compel Defendants to respond to

the following interrogatories:

4.    Identify any internal complaints, administrative
      charges or lawsuits in the last five (5) years
      alleging employment discrimination and/or
      retaliation against any of the Defendants.  For
      each state:
      a.    the date when the complaint, charge or lawsuit
            was filed;
      b.    the tribunal, forum and civil number or other
            numerical designation assigned to the matter;
      c.    the name of the complainant or plaintiff;
      d.    current status of the matter; and
      e.    final disposition of the matter.

      . . . .

-18-

> 7. Explain in detail the manner in which the Defendants investigated Plaintiff's complaints of discrimination.

(Docket Entry 41-1 at 4, 6.)

Similarly, Plaintiff seeks an order compelling Defendants to respond to the following document requests:

> 6. Produce all communications created, sent or received by [Defendant] Ziefle, Panchabi Vaithiynathan, Dan Orr, Betty Orr, the Board of Directors and/or any other Defendant manager concerning Plaintiff including, but not limited to, Plaintiff's job performance; salary; promotion(s) requested and/or received; job duties, separation of employment; complaints of discrimination; and any other communications related to the terms of Plaintiff's employment.
>
> . . . .
>
> 11. Produce all communications between Plaintiff and any of Defendants' managers, including but not limited to [Defendant] Ziefle and Panchabi Vaithiynathan, about: (i) Plaintiff's complaints of discrimination and Defendants' investigation of the same; and (ii) Plaintiff's separation from Defendants, including but not limited to communications regarding the allegations contained in Paragraphs 48 and 49 of the Complaint.
>
> . . . .
>
> 14. Produce the complete state and federal corporate tax returns for Defendants for the years 2005 to present.
>
> . . . .
>
> 15. Produce all profit and loss statements for Defendants for the years 2005 through the present.
>
> . . . .
>
> 16. Produce all corporate balance sheets for Defendants for the years 2005 through the present.

(Docket Entry 42-2 at 5-10.)

-19-

### i. Interrogatory No. 4

Plaintiff's brief supporting the instant Motion reports a "willing[ness] to limit the scope of Interrogatory No. 4 solely to internal complaints, charges or lawsuits alleging race discrimination and/or retaliation during the last five years." (Docket Entry 42 at 13.) Defendants, however, continue to object on relevance grounds. (See Docket Entry 56 at 8-9.) "Evidence of other lawsuits is typically only relevant if those lawsuits involve similar claims and can be used to establish a pattern or habit or routine practice." F & A APLC v. Core Funding Grp., L.P., No. 07-543-D-M2, 2009 WL 2214184, at *2 (M.D. La. July 23, 2009) (unpublished). Accordingly, although a "request for information about all discrimination actions filed against an employer sweeps too broadly," Dooley v. Recreation & Parks Comm'n for Parish of E. Baton Rouge, No. 08-715-A-M2, 2009 WL 1939022, at *4 (M.D. La. July 6, 2009) (unpublished) (internal quotation marks and citation omitted), a plaintiff generally may pursue discovery limited to "the relevant time period, to the particular type of discrimination alleged in the complaint, and to the divisions or departments where the plaintiff and his/her supervisors worked," id.

Given those general principles, Plaintiff's Interrogatory No. 4, with the restrictions she proposes (see Docket Entry 42 at 13) and an additional limitation to matters involving anyone who supervised Plaintiff or participated in any alleged employment action directed at her, warrants enforcement. Defendants' contention that Plaintiff may have discovery only as to allegations

-20-

by similarly-situated individuals and that no such individuals exist because only "Plaintiff requested and took a medical leave . . ., then decided, based upon the advice of her legal counsel, not to return to work, and informed Defendants of the same" (Docket Entry 56 at 9) takes too narrow a view of relevance at the discovery stage, see generally Kinetic Concepts, Inc. v. Convatec Inc., 268 F.R.D. 226, 238-39 (M.D.N.C. 2010) (discussing scope of discovery). Accordingly, the Court will order that, on or before May 14, 2013, Defendants respond to Plaintiff's Interrogatory No. 4, as limited above to remedy its original overbreadth.

### ii. Interrogatory No. 7

Interrogatory No. 7, which seeks discovery regarding the investigation by Defendants' counsel of Plaintiff's discrimination allegations, runs afoul of the attorney-client privilege and work product doctrine, as outlined in Section I. The Court therefore denies this aspect of Plaintiff's instant Motion.

### iii. Document Request No. 6

Document Request No. 6 seeks "all communications created, sent or received by [Defendant] Ziefle, [three other employees of the corporate Defendants], the Board of Directors [of the corporate Defendants] and/or any other [of] Defendant[s'] manager[s] concerning Plaintiff . . . ." (Docket Entry 42-2 at 5.) In bringing the instant Motion, Plaintiff represented that Defendants produced "only a small handful" of documents responsive to said Request. (Docket Entry 42 at 14.) Defendants countered that, despite their objections to the overbreadth and burdensomeness of

-21-

Document Request No. 6, they "conducted a good faith review of their documents and produced over 6,000 responsive documents." (Docket Entry 56 at 16.) Moreover, Defendants attached a letter, dated November 1, 2012, from their counsel to Plaintiff's counsel, describing their facially-reasonable efforts to locate materials responsive to Document Request No. 6 and noting: "We are glad to consider additional search terms that Plaintiff believes may need to be considered, assuming such additional requests are not duplicative, are relevant to Plaintiff's allegations, and are reasonably accessible without causing an undue burden or cost to our clients." (Docket Entry 56-9 at 2-3.) Plaintiff's Reply does not dispute Defendants' representations as to their search efforts and the quantity of documents produced; nor does said Reply otherwise address the adequacy of Defendants' search and production. (See Docket Entry 63.)

Under these circumstances, the Court denies relief to Plaintiff based on the conclusion that the burden of any further response to this Request would "outweigh[] its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues," Fed. R. Civ. P. 26(b)(2)(C), particularly given the Request's obvious overbreadth, see, e.g., Regan-Touhy v. Walgreen Co., 526 F.3d 641, 649-50 (10th Cir. 2008) ("[W]e agree with the district court that [the request for] . . . 'all documents . . . that refer to, mention or relate in any way to [the] [p]laintiff

-22-

. . .' is overly broad. . . .");  DeFreitas v. Tillinghast, No.
2:12CV235JLR, 2013 WL 209277, at *3 (W.D. Wash. Jan. 17, 2013)
(unpublished) ("[The requests at issue] are not reasonably targeted
or specific, and are overbroad on their face.  [The] burden of
producing many years worth of all communications relating to [the
plaintiff] outweighs the likely benefits to [him], and the great
cost required to produce all such communications . . . .").[5]

### iv. Document Request No. 11

In response to Document Request No. 11, which demands "all
communications between Plaintiff and Defendants' managers . . .
about (i) Plaintiff's complaints of discrimination and Defendants'
investigation of the same; and (ii) Plaintiff's separation from
Defendants" (Docket Entry 42-2 at 8 (emphasis added)), Defendants
state: "There are no materials responsive to Plaintiff's [Document]
Request [No.] 11 other than what has already been produced and what
is identified on Defendants' privilege log" (Docket Entry 56 at 16
(citing Docket Entry 42-5)).  Plaintiff's Reply offers no basis to
question this representation.  (See Docket Entry 63.)

As to the issue of Defendants' privilege log, Plaintiff's
initial brief in support of the instant Motion asserts that
"Defendants should be compelled to submit to the Court for in
camera review the documents identified in their privilege log, so
that the Court can determine whether these documents are

---

[5] Given this conclusion, the Court declines Plaintiff's
generalized demand (see Docket Entry 42 at 14) for in camera
examination of documents in Defendants' privilege log to determine
if they should have to make further production as to this Request.

-23-

discoverable (in whole or part)." (Docket Entry 42 at 18.) Only the first-listed document in Defendants' privilege log, i.e., the document identified as "Emails between [Plaintiff], [Defendant] Ziefle, and/or [Defendants' counsel]" (Docket Entry 42-5 at 2), could contain material responsive to Document Request No. 11.[6] Although Defendants' privilege log describes said document as subject to the work product doctrine, said log does not show how the work product doctrine would apply to any e-mail which Plaintiff sent or received. See generally JJK Mineral Co., LLC v. Swiger, ___ F.R.D. ___, ___ n.2, 2013 WL 663283, at *6 n.2 (N.D.W. Va. 2013) ("Work product may be discoverable if a party waives its immunity and discloses its work product . . . ."). Because the Court cannot determine from Defendants' privilege log what portion(s) of this e-mail chain Plaintiff sent or received or how the work product doctrine would apply to any e-mail Plaintiff sent or received, the Court will order Defendants to submit said document to the Court for in camera inspection, along with a sealed memorandum of no more than three pages justifying the withholding (or redaction) of said document, on or before May 14, 2013.

v. Document Request Nos. 14-16

"Document Request Nos. 14-16 seek the following information for the years 2005 to the present: (i) Defendants' state and

_____

[6] In other words, Plaintiff does not appear as an author or recipient of any of the other documents listed in Defendants' privilege log (see Docket Entry 42-5) and thus such documents could not constitute "communications between Plaintiff and any of Defendants' managers" (Docket Entry 42-2 at 8).

federal corporate tax returns; (ii) Defendants' profit and loss statements; and (iii) Defendants' corporate balance sheets." (Docket Entry 42 at 15.) According to her supporting brief, "in an effort to compromise on this issue, Plaintiff is willing to narrow [these requests] to the 2010 to present time-period." (Id.) To establish the relevance of such discovery, said brief points only to "Plaintiff's punitive damages claims." (Id. (citing Cook v. Robinson, No. 5:11CV6, 2011 U.S. Dist. LEXIS 89307, at *9 (N.D.W. Va. Aug. 11, 2011) (unpublished), and Shearin v. Safelite Glass Corp., No. 4:97CV81BO2, 1998 U.S. Dist. LEXIS 8115, at *1-5 (E.D.N.C. Apr. 15, 1998) (unpublished)).) Defendants oppose discovery of the requested financial information, even as narrowed, on the ground that "Plaintiff has made no showing that her claim for punitive damages is viable, and only if and when she does will such documents potentially become discoverable." (Docket Entry 56 at 17 & n.18 (citing Interstate Narrow Fabrics, Inc. v. Century USA, Inc., No. 1:02CV00146, 2004 WL 444570, at *1 (M.D.N.C. Feb. 24, 2004) (unpublished), and Blount v. Wake Elec. Membership Corp., 162 F.R.D. 102, 105 (E.D.N.C. 1993)).) Plaintiff's Reply does not address that argument. (See Docket Entry 63.)

"Unless otherwise limited by court order, . . . [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b)(1). "[A] defendant's financial position is a proper consideration in assessing punitive damages, see Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 22 (1991)." Stamathis v. Flying J,

-25-

<u>Inc.</u>, 389 F.3d 429, 442 (4th Cir. 2004) (internal parallel citation omitted).  Moreover, Plaintiff's Complaint lists "punitive damages" in the final relief request.  (Docket Entry 1 at 12.)  In addition, the Complaint expressly asserts an "entitle[ment] to punitive damages in accordance with and as provided by 42 U.S.C. § 1981," as part of Plaintiff's claims under Section 1981 for racially discriminatory and retaliatory employment actions.  (<u>Id.</u>, ¶¶ 60, 67.)  Further, in connection with Plaintiff's state law claims for "Wrongful Discharge in Violation of North Carolina Public Policy" and "Negligent Retention and Supervision," the Complaint alleges in conclusory terms that "[t]he conduct, acts and omissions of the Defendants constitute malicious, willful and wanton conduct or were in reckless disregard and indifference to [Plaintiff's] rights" (<u>id.</u>, ¶¶ 74, 80), language consistent with North Carolina's statutory standard for punitive damages, <u>see</u> N.C. Gen. Stat. § 1D-15(a)(2) and (3) (identifying "Malice" and "Willful and wanton conduct" as among "aggravating factors" a plaintiff must prove to support award of punitive damages).

However, "[e]ven assuming that [the requested financial] information is relevant (in the broadest sense), the simple fact that [it] is discoverable . . . does not mean that discovery must be had.  On its own initiative or in response to a motion for protective order under [Federal] Rule [of Civil Procedure] 26(c), a district court may limit . . . 'discovery methods otherwise permitted' . . . if it concludes that '(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some

-26-

other source that is more convenient, less burdensome, or less expensive . . . or (iii) the burden or expense of the proposed discovery outweighs its likely benefit.'" <u>Nicholas v. Wyndham Int'l Inc.</u>, 373 F.3d 537, 543 (4th Cir. 2004) (quoting Fed. R. Civ. P. 26(b)(2)(C)). Additionally, "[a] court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including [as pertinent here] . . . (A) forbidding the disclosure or discovery; (B) specifying . . . [the] time . . . for the disclosure or discovery; . . . [or] (D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters . . . ." Fed. R. Civ. P. 26(c)(1).

A noted scholar who has served since 1996 as a reporter to the Advisory Committee on Civil Rules of the Judicial Conference of the United States has observed that litigants often pursue discovery of sensitive matters less for the substantive value of such discovery and more for "the strategic value of discovery into sensitive areas. One recurrent example on the plaintiff side is discovery regarding a defendant's net worth or financial condition in connection with claims for punitive damages." Richard L. Marcus, <u>A Modest Proposal: Recognizing (At Last) that the Federal Rules Do Not Declare that Discovery is Presumptively Public</u>, 81 Chi.-Kent L. Rev. 331, 340 (2006). Given such considerations, for decades, courts (particularly state courts) have "conclude[d] that examination of a defendant's financial records or status, either to establish liability for punitive damages or the amount to be

-27-

awarded therefor, should not be permitted until plaintiffs have demonstrated some factual basis for their punitive damage claim." Moran v. International Playtex, Inc., 103 A.D.2d 375, 377, 480 N.Y.S.2d 6, 8 (N.Y. App. Div., 2d Dep't 1984) (internal citations omitted). In other words, "[t]he ease with which claims for punitive damages can be asserted makes it apparent that such claims may result in abuse and harassment if their mere assertion entitles plaintiffs to financial discovery." Id. (internal citations omitted); accord, e.g., Tennant v. Charlton, 377 So.2d 1169, 1170 (Fla. 1979) ("[T]rial court[s] should always be sensitive to the protection of a party from harassment and from an overly burdensome inquiry. . . . If plaintiffs were allowed unlimited discovery of defendants' financial resources in cases where there is no actual factual basis for an award of punitive damages, the personal and private financial affairs of defendants would be unnecessarily exposed and, in some cases, the threat of such exposure might be used by unscrupulous plaintiffs to coerce settlements . . . .").[7]

In Blount (one of the cases cited by Defendants in opposition to the financial discovery Plaintiff seeks to compel), our neighboring federal court to the east took note of such cases

---

[7] Other decisions recognize that the existence of a protective order restricting a plaintiff's ability to further disseminate sensitive financial information (a consideration which Plaintiff cited in support of her argument for compelled disclosure of such information in this case (see Docket Entry 42 at 15)) does not sufficiently address the above-referenced concerns. See, e.g., Ledee v. Devoe, 484 S.E.2d 344, 348 (Ga. App. 1997) ("Who would want any strangers to have access to the type of financial information requested in this case . . . regardless of the safeguards imposed to restrict access only to those strangers?").

"support[ing] the proposition that a plaintiff must make some kind of factual showing that a viable claim for punitive damages exists before allowing discovery of financial worth." Blount, 162 F.R.D. at 105. The Blount Court then declined to compel any discovery of the financial information requested in that case until the defendants had an opportunity to file a dispositive motion directed to the punitive damages issue. See id. United States Magistrate Judge Wallace W. Dixon subsequently cited Blount with approval in refusing to compel production of tax returns in a case where "there ha[d] been no credible showing to date by [the] [p]laintiff that [it] [wa]s entitled to an award of punitive damages on the claims alleged [t]here." Interstate Narrow Fabrics, Inc. v. Century USA, Inc., 1:02CV146, at 1 n.1 (M.D.N.C. Sept. 22, 2003) (unpublished). In so ruling, Magistrate Judge Dixon stated that, "[i]f that [credible] showing [of entitlement to punitive damages] is made, or if the punitive damages claim survives summary judgment, the motion for production of [the] tax returns may be renewed." Id.[8]

At least two federal courts have declined to follow Blount on the grounds that it merely reflects North Carolina law, that (when a plaintiff has requested punitive damages) financial information satisfies the relevance test for discovery under the Federal Rules

---

[8] Defendants' brief opposing the instant Motion cites a subsequent decision in the same case, in which then-Chief Judge N. Carlton Tilley, Jr. referenced Magistrate Judge Dixon's earlier ruling in the course of granting a renewed motion to compel production of the tax returns at issue after the plaintiff's punitive damages claim survived summary judgment. See Interstate Narrow Fabrics, 2004 WL 444570, at *1.

-29-

of Civil Procedure, and/or that delaying discovery pending a factual showing as to the basis for punitive damages or motion practice directed at the merits of the punitive damages demand would introduce unwarranted inefficiencies. See Grosek v. Panther Transp., Inc., 251 F.R.D. 162, 166 n.3 (M.D. Pa. 2008); E.E.O.C. v. Environmental & Demolition Servs., Inc., 246 F.R.D. 247, 249 (D. Md. 2007). The Court finds such reasoning unpersuasive. First, the rationale behind Blount (as endorsed by Magistrate Judge Dixon and cases from numerous jurisdictions) does not represent some quirk of North Carolina law, but instead fits comfortably within the discovery principles enshrined in Federal Rule of Civil Procedure 26. Second, as discussed above, relevance alone does not determine the proper scope of discovery under Federal Rule of Civil Procedure 26. Third, the need to mitigate the recognized risk of harassment and undue burden that arises in this context outweighs the concern for inefficiency attendant to the remedy prescribed.

Accordingly, this Court opts to join the growing number of federal courts across the country that take the general view that the mere inclusion of a bald demand for punitive damages in a pleading does not entitle a litigant to discovery of sensitive financial information. See, e.g., Jackson-Heard v. Elizabeth City State Univ., No. 2:12CV8BO, 2013 WL 594896, at *2 (E.D.N.C. Feb. 15, 2013) (unpublished) ("[A] number of courts have required a prima facie showing of entitlement to punitive damages before requiring production of sensitive financial information. . . . The court finds that plaintiff has not demonstrated that the discovery

-30-

she seeks is relevant at this time. Most basically, she has not shown that she is entitled to punitive damages."); Richbourg v. Jimerson, No. CV-12-136-TUC-BGM, 2012 WL 4355906, at *2 (D. Ariz. Sept. 24, 2012) (unpublished) ("Although [Federal] Rule [of Civil Procedure] 26(b)(1) allows for broad discovery, a litigant's right to that discovery is not unlimited. . . . [T]he [c]ourt has the inherent power to control discovery as it deems necessary. [The] [p]laintiffs' [c]omplaint states that '[the] [d]efendants' conduct was fraudulent, evil and in bad faith, thus entitling [the] [p]laintiffs to punitive damages in an amount to be proven at trial. [The plaintiffs] have not plead any facts to support this broad conclusion. . . . [I]n light of the lack of a factual basis, as well as the burden to the [d]efendants, the financial information is not relevant at this time." (internal citations omitted)); Lanigan v. Babusch, No. 11C3266, 2011 WL 5118301, at *4 (N.D. Ill. Oct. 27, 2011) (unpublished) ("[The] [p]laintiff seeks punitive damages on the broad and conclusory allegation that [the defendant's] conduct was intentional, malicious, willful and wanton. Accordingly, the [c]ourt finds it more appropriate to postpone [net worth] discovery until it appears that [the defendant] will be liable for punitive damages.").[9]

---

[9] Even the two cases cited by Plaintiff in support of her request for compelled production of Defendants' financial information (see Docket Entry 42 at 15) do not conflict with this trend. More specifically, the first of those cases came before the court only after the defendant conceded that the plaintiff "had established a prima facie case for punitive damages . . . [and] agree[d] to produce financial information," Shearin, 1998 U.S.
                                                        (continued...)

In this case, application of that general rule defeats Plaintiff's request for compelled production of Defendants' corporate tax returns, profit and loss statements, and corporate balance sheets. As with the pleadings in the above-cited cases, Plaintiff's Complaint does not support its demand for punitive damages with factual allegations that clearly would warrant such relief, but instead relies on boilerplate language. (See Docket Entry 1 at 9-12.) Nor, in connection with his instant Motion, did Plaintiff proffer any factual showing that would justify a punitive damages award. (See Docket Entries 41, 42, 63.)

Moreover, the Fourth Circuit has recognized that "not every action under [S]ection 1981 warrants an award of punitive damages. . . . It is an extraordinary remedy and is designed to punish and deter particularly egregious conduct. Although any form of discrimination [or retaliation] constitutes reprehensible and abhorrent conduct, not every lawsuit under [S]ection 1981 calls for submission of this extraordinary remedy to a jury." Stephens v. South Atl. Canners, Inc., 848 F.2d 484, 489-90 (4th Cir. 1988) (internal citation omitted). Similar considerations apply to Plaintiff's state-law claims. See, e.g., Ayscue v. Mullen, 78 N.C. App. 145, 149, 336 S.E.2d 863, 866 (1985) ("Punitive damages are

---

[9](...continued)
Dist. LEXIS 8115, at *2, and, in the other case, the court quoted with approval the proposition that "'[t]ax returns may generally be discovered for purposes of supporting a punitive damages claim only where the plaintiff has made a prima facie showing of entitlement to them,'" Cook, 2011 U.S. Dist. LEXIS 89307, at *9 (quoting SMD Software, Inc. v. Emove, Inc., No. 5:08CV403FL, 2010 WL 2232261, at *2 (E.D.N.C. June 2, 2010) (unpublished)).

-32-

allowed only in cases where the tortious conduct is accompanied by some element of aggravation. . . . [T]here was an entire lack of those elements of outrageous conduct that would subject the defendants to punitive damages.").

Finally, the facts alleged in the Complaint reflect that: (1) the corporate Defendants hired Plaintiff, promoted her, and retained her over a number of years, during which time they reduced the size of their work-force by laying-off others (Docket Entry 1 at 3); (2) Plaintiff received a raise in 2010 (at a time when Defendant Ziefle apparently led the corporate Defendants) (id. at 5); (3) Defendant Ziefle fired others outside of Plaintiff's race (id. at 7); and (4) after Defendants allegedly fired Plaintiff, Defendant Ziefle offered to re-hire her (id. at 8-9). Assuming that Plaintiff has asserted a viable claim against Defendants for race discrimination and/or retaliation in violation of Section 1981 or for related state-law torts, the foregoing conceded facts, at a minimum, appear to call into serious question the viability of any request for punitive damages in light of the applicable law.

Under these circumstances, the Court will not compel Defendants to respond to Document Request Nos. 14-16 at this time. Plaintiff, however, may file a new motion making a renewed request for discovery of this sort if she can make a factual showing that would support an award of punitive damages. Alternatively, if the Court ultimately denies Defendants' pending Motions for Judgment on the Pleadings and for Summary Judgment (Docket Entries 19 and 59) as to any of Plaintiff's claims and Defendants do not otherwise

secure an order precluding submission of Plaintiff's punitive damages demand to the fact-finder, Plaintiff could seek production of such evidence before trial, perhaps even without any further factual showing. Given those possibilities and to avoid delay if and when Plaintiff's right to discovery of financial information becomes ripe, the Court will order Defendants to gather some such material now, so that it can make immediate service on Plaintiff at the time production becomes appropriate.

In that regard, the Court notes that, in general, "[o]nly current net worth relates to punitive damages. Net sales and income, even if current, is not relevant . . . ." Happel v. Wal-Mart Stores, Inc., No. 02C7771, 2007 WL 495277, at *3 (N.D. Ill. Feb. 9, 2007) (unpublished); see also Metropolitan Bus. Mgmt, Inc. v. Allstate Ins. Co., No. CV05-8306CAS(CWx), 2009 WL 2424291, at *3 (C.D. Cal. Aug. 6, 2009) (observing that "net worth . . . is defined by Black's Law Dictionary as 'a measure of one's wealth, usually calculated as the excess of total assets over total liabilities'" (internal brackets omitted)), aff'd, 448 F. App'x 677 (9th Cir. 2011). Further, courts generally do not order production of tax returns if an alternative source of equivalent information exists. See Interstate Narrow Fabrics, 2004 WL 444570, at *2. Accordingly, at this time, the Court will order Defendants to gather only corporate balance sheets for the period from 2011 to the present or other comparable documents that reasonably would show their current net worth.

-34-

## B. Production of Corporate Designee

Plaintiff moves the Court to compel Defendants to produce a witness to respond to questions regarding "factual and other questions relating to Defendant's investigation of Plaintiff's discrimination complaint," as well as "any investigation Defendants conducted in response to [Ms.] Njenga's EEOC charge." (Docket Entry 42 at 16.) Given the discussion in Section I regarding applicability of the attorney-client privilege and/or work product doctrine to Defendants' investigations into Plaintiff's allegations and Ms. Njenga's EEOC charge, the Court will deny this request.

## C. Deposition of Dan Orr

Plaintiff and Defendants failed to reach an agreement on the time and location for the deposition of Dan Orr. (See id. at 4-5.) According to Plaintiff, in mid-January 2013, she "advised Defendants that she wanted to depose Defendants' witness Dan Orr" and, because the Parties could not agree on a date for said deposition over the next month, she "served a notice scheduling Mr. Orr's deposition for February 27, 2013 at Plaintiff's counsel's offices in Chapel Hill." (Id. at 4.) Plaintiff contends that, when Defendants informed her that Mr. Orr would be out of the country from February 22, 2013, through the end of the month, she "sent an email dated February 19, 2013 scheduling Mr. Orr's deposition for February 21, 2013 in Chapel Hill" and that Defendants "refused to produce Mr. Orr for deposition in Chapel Hill on that date." (Id. at 5.) Plaintiff states that, "to save the [P]arties and the Court time and resources, Plaintiff offered

-35-

a compromise proposal that would have allowed the [P]arties to depose Mr. Orr and Mr. Moore . . . after February 27, 2013 with the Court's permission [which] Defendants rejected." (Id.)

Defendants present a somewhat differing account of the events surrounding Mr. Orr's proposed deposition. According to Defendants, after Plaintiff informed them, in January 2013, that she planned to depose Dan Orr, they proposed February 20, 2013, and Plaintiff confirmed acceptance of that date. (Docket Entry 56 at 5 (citing Docket Entry 56-2 at 2).) Defendants further assert that, after the Parties agreed to a mediation date of February 26, 2013, and a deposition date for another witness of February 21, 2013, Plaintiff sought to move the mediation to February 20, 2013, and Mr. Orr's deposition to February 25-27, 2013, but Defendants responded that Mr. Orr was out of the country at that time. (Id.) Per Defendants, after further informing Plaintiff that Mr. Orr was unavailable on February 21 and 22, 2013, they suggested deposing Mr. Orr on February 20, 2013 - the same day as the mediation - or conducting the mediation on the earlier-agreed date of February 26, 2013. (Id. at 6.) Defendants contend that Plaintiff refused to conduct the deposition on the same day as the mediation and instead requested that Mr. Orr's deposition proceed on February 18 or 19, 2013, or February 28 or March 1, 2013, if the parties filed a joint motion to extend discovery. (Id.) Defendants acknowledge that they did not consent to extend discovery and responded again that Mr. Orr would make himself available on February 19 or 20, 2013. (Id.) Plaintiff thereafter sent a notice indicating an intention

-36-

to depose Mr. Orr on February 27, 2013 - a date she knew he was out of the country. (Id. at 7.)[10]

Under these circumstances, the Court will order the Parties to confer and to establish a mutually acceptable date, time, and location for Mr. Orr's deposition to occur before May 14, 2013.

### D. Expenses

As a final matter, Plaintiff requests "expenses, including reasonable attorney's fees, incurred in having to bring [the instant Motion]." (Docket Entry 42 at 19.) "Rule 37 provides generally for sanctions against parties or persons unjustifiably resisting discovery." Fed. R. Civ. P. 37 advisory committee's notes, 1970 Amend. More specifically:

> If the motion is granted - or if the disclosure or requested discovery is provided after the motion was filed - the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if:
>
> (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;
>
> (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or
>
> (iii) other circumstances make an award of expenses unjust.

---

[10] Mr. Orr also noted that Plaintiff provided a notice, rather than a subpoena, despite the fact that Mr. Orr considers himself a third-party witness. (See Docket Entry 56 at 7 n.4.) Because the Parties and Mr. Orr appear to have agreed that he should sit for a deposition, the Court declines to address that matter further.

Fed. R. Civ. P. 37(a)(5)(A).  However, "[i]f the motion is granted in part and denied in part, the court . . . may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion."  Fed. R. Civ. P. 37(a)(5)(C).  Plaintiff has achieved very little relief via the instant Motion and thus the Court declines to order any cost-shifting in her favor.[11]

### III. Competing Motions Regarding Deposition of Chris Moore

During the discovery period, a dispute arose between Defendants and non-party Chris Moore (represented by Plaintiff's counsel) regarding the location and time of Mr. Moore's deposition. (See Docket Entries 37 and 45.)  Mr. Moore, Plaintiff's husband, contends that, in late January 2013, Defendants advised Plaintiff that they wanted to take Mr. Moore's deposition and sent an email dated January 28, 2013, stating that they would seek to depose Mr. Moore on February 21, 2013.  (Docket Entry 36 at 2.)  However, Mr. Moore maintains that he did not receive a subpoena until February 17, 2013, and that he only then learned of the proposed deposition location and time - i.e., Greensboro at 10:00 a.m.  (Id. at 2-3.)  According to Mr. Moore, on February 19, 2013, he objected to that proposal and offered to appear at his counsel's offices in Chapel

---

[11] Indeed, given that the Court has deemed most of Plaintiff's arguments in support of the instant Motion meritless, it likely could require Plaintiff to show cause why she should not have to pay a significant portion of Defendants' expenses occasioned by its filing.  However, in light of the fact that Plaintiff obtained some relief and arguably had substantial justification for some of the unsuccessful aspects of the instant Motion, the Court exercises its discretion under Federal Rule of Civil Procedure 37(a)(5)(C) to leave the Parties to bear their own respective expenses.

-38-

Hill, on February 21, 2013, at 1:00 p.m. (Id. at 3.) Mr. Moore acknowledges that Defendants agreed to his proposed time, but complains about their insistence that Greensboro remain the deposition site. (Id. at 4.)

In Mr. Moore's view, because he drives Plaintiff from their home in Roxboro, North Carolina, to her job in Clarksville, Virginia, Defendants' proposal to depose him in Greensboro constitutes an undue burden. (See id. at 2.)[12] Mr. Moore seeks "an order: (i) quashing Defendants' third-party subpoena/deposition notice; (ii) requiring that Defendants modify any future subpoena so that the deposition location be at a place that is closer to Mr. Moore's residence in Roxboro, North Carolina; (iii) requiring that Defendants modify any future subpoena so that the deposition date does not interfere with Mr. Moore's work schedule at his new job; and (iv) awarding to Mr. Moore the fees and costs incurred in having to prosecute this motion." (Docket Entry 37 at 1.)

Defendants filed a competing Motion to Compel (Docket Entry 45), which argues that, despite their confirming Mr. Moore's availability on February 21, 2013 (id. at 3), changing the deposition time to accommodate his schedule (id. at 4), and

_____

[12] Defendants observe that "the driving distance between Mr. Moore's residence in Roxboro and the Greensboro location [proposed for the deposition] is 72.59 miles, with an estimated driving time of 1 hour and 35 minutes. Interestingly, the driving distance between Mr. Moore's residence in Roxboro and the Chapel Hill location Plaintiff's counsel indicated would *not* be 'unduly burdensome' is quite comparable -- 50.43 miles, with an estimated driving time of 1 hour and 6 minutes." (Docket Entry 46 at 9-10 (citing Docket Entry 45-8).)

-39-

receiving an email from Mr. Moore's counsel on February 19, 2013, indicating that Mr. Moore could appear in Greensboro on February 21, 2013, if Defendants "insist[ed]" on that location (id. at 5 (citing Docket Entry 45-6 at 4)), Mr. Moore did not appear for his deposition (id. at 6). Defendants request that the Court compel Mr. Moore to appear for a deposition. (Id.)

The entirety of the instant dispute focuses on the time and location of Mr. Moore's deposition. Given that the proposed deposition date has now passed, the instant Motions are effectively moot; however, the Court instructs counsel to immediately confer in an attempt to find a mutually acceptable date, time, and location for Mr. Moore's deposition to occur on or before May 14, 2013.[13]

### IV. Plaintiff's Motion to Extend Discovery

Based largely on the foregoing discovery disputes, Plaintiff seeks a six-week extension of the discovery period. (See Docket Entry 35.) Defendants oppose "a blanket extension on all discovery . . . [in favor of] allow[ing] the Court . . . [to make] directives tailored to the actual motions after they are decided by the

---

[13] The Court will not award any expenses to Mr. Moore under Federal Rule of Civil Procedure 45(c)(1). In this regard, the Court finds no basis to conclude that the designation of Greensboro as the location for his deposition imposed an undue burden. Accordingly, although the Court encourages counsel to seek common ground, it will not require Defendants to depose him elsewhere based on the existing record. The Court similarly adjudges that Mr. Moore has no right to have the setting of his deposition dictated absolutely by his work schedule and/or his practice of driving Plaintiff to work, see Irons v. Karceski, 74 F.3d 1262, 1264 (D.C. Cir. 1996) (rejecting notion that any loss of earnings due to deposition constitutes undue burden), and thus the Court declines to enter any prospective order to such effect.

-40-

Court." (Docket Entry 43 at 3-4.) A scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The Court concludes that good cause does not support a general extension of discovery and that the specific relief ordered by the Court suffices.

## V. Conclusion

The attorney-client privilege and/or work product doctrine preclude discovery of Defendants' investigations into Plaintiff's allegations and Ms. Njenga's EEOC charge. With respect to written discovery sought by Plaintiff, Defendants must serve Plaintiff with a limited response as to one interrogatory, must make a limited in camera submission, and must prepare some financial documents for possible future service. Finally, the Parties must cooperate to accomplish the depositions of Mr. Orr and Mr. Moore in short order and without a general extension of the discovery period.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Protective Order Regarding Certain Topics Listed in Plaintiff's Amended Rule 30(b)(6) Notice of Deposition (Docket Entry 31) and Defendants' Motion for Protective Order Regarding Plaintiff's Notice to Depose Defendants' Legal Counsel (Docket Entry 33) are **GRANTED.**

**IT IS FURTHER ORDERED** that, pursuant to Federal Rules of Civil Procedure 26(c)(3) and 37(a)(5)(A), Plaintiff must show cause why the Court should not order Plaintiff and/or her counsel to pay the reasonable expenses, including attorney's fees, Defendants incurred in connection with their Motions for Protective Order (Docket Entries 31 and 33), as follows:

-41-

(1) on or before May 14, 2013, Defendants either shall file a notice waiving any right to reimbursement of expenses, including attorney's fees, related to said Motions or shall serve Plaintiff with a statement of the reasonable expenses, including attorney's fees, Defendants incurred in connection with said Motions;

(2) if Defendants timely serve Plaintiff with such an expense statement, on or before May 28, 2013, Plaintiff either shall file a notice confirming her agreement to pay the expenses claimed by Defendants or shall file a memorandum of not more than 10 pages setting out Plaintiff's argument as to why the Court should not require Plaintiff and/or her counsel to pay such expenses (including any argument challenging the reasonableness of such expenses, along with a certification that Plaintiff has attempted to confer in good faith with Defendants about that subject);

(3) if Plaintiff timely files a memorandum contesting payment of expenses claimed by Defendants, on or before June 11, 2013, Defendants may file a response of not more than 10 pages; and

(4) if Defendants timely file a response, on or before June 18, 2013, Plaintiff may file a reply of not more than five pages.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Compel Discovery (Docket Entry 41) is **DENIED**, except that, on or before May 14, 2013:

(1) Defendants shall respond to Interrogatory No. 4 as limited to any internal complaints, charges, or lawsuits alleging race discrimination and/or retaliation during the last five years

-42-

involving anyone who supervised Plaintiff or participated in any alleged employment action directed at Plaintiff;

(2) Defendants shall submit to the Court for in camera inspection the first document listed in their privilege log and a memorandum of not more than three pages explaining how the work product doctrine applies to said document;

(3) Defendants shall gather corporate balance sheets covering the period from 2011 to the present or other comparable documents that reasonably would show the corporate Defendants' current net worth, so that they can make immediate service of such material on Plaintiff if later warranted; and

(4) the Parties shall conduct the deposition of Dan Orr on mutually acceptable terms as to date, time, and location.

**IT IS FURTHER ORDERED** that the Motion to Quash and/or Modify Third-Party Subpoena Served upon Chris Moore (Docket Entry 37) and Defendants' Motion to Compel Compliance with Subpoena (Docket Entry 45) are **DENIED**, but the Parties shall conduct the deposition of Chris Moore on or before May 14, 2013, on mutually acceptable terms as to date, time, and location.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Extend the February 27, 2013 Discovery Deadline (Docket Entry 35) is **DENIED**.

/s/ L. Patrick Auld

**L. Patrick Auld**
**United States Magistrate Judge**

April 30, 2013

-43-